UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 18 CR 471-2 |
| v. | |
| TILLMAN LIGGINS III | Judge Robert W. Gettleman |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The United States of America, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits their position paper with respect to the sentencing of defendant Tillman Liggins III. For the reasons stated herein, the government respectfully requests that the Court sentence defendant to 63 months' imprisonment, a low-end advisory Guidelines sentence for Count Three (fraud by wire), in addition to a mandatory consecutive of two years' imprisonment on Count Four (aggravated identity theft).

**I.    Procedural History**

Defendant Tillman Liggins was charged by superseding information with wire fraud, in violation of Title 18, United States Code, Section 1343 (Count Three); and aggravated identity theft, in violation of Title 18, United States Code, Section 1028A(a)(1) (Count Four). On April 23, 2019, defendant appeared before the Honorable Robert W. Gettleman and entered a plea of guilty to both counts of the

information, with the benefit of a written plea agreement with the government. This matter is set for a sentencing hearing on October 30, 2019.

## II. Factual Background

### *Count Three*

With respect to Count One, beginning not later than in or around February 2012, and continuing until at least in or around March 2015, defendant Tillman Liggins III ("Liggins"), along with his wife co-defendant Chinita Williams-Liggins ("Williams-Liggins"), and others, participated in a scheme to defraud the United States Department of Treasury. As part of the scheme, defendant obtained personal identifying information, including names, social security numbers, and dates of birth, of at least 10 individuals without their knowledge or consent. Defendant used that information to prepare false and fraudulent individual federal income tax returns (Forms 1040) for tax years 2011, 2012, 2013, and 2014. The refunds were directed for deposit into bank accounts defendant and his wife controlled, and into bank accounts of several family members and others.

Through the use of online tax preparation software, defendant electronically transmitted returns to the Internal Revenue Service ("IRS") via interstate wire from the Northern District of Illinois to IRS Service Centers in Kansas City, Missouri and elsewhere. The returns claimed false amounts related to items of income, credits, and deductions. Some of these returns included false Schedule C business income, false Earned Income Tax Credits, and false education and other credits to which defendant well knew the taxpayer was not actually entitled.

*Search Warrant Execution*

Agents obtained and executed a search warrant at the Liggins' residence. During the search, agents recovered a gold colored bag containing several notebooks filled with handwritten personal identifying information and notes tracking the filing of tax returns using that information. The bag was found in a laundry basket behind the Liggins' bed. Agents also recovered loose pieces of paper with handwritten lists of personal identifying information for hundreds of individuals. Some of the pieces of paper bore the letterhead of Financial Management Systems (FMS), a student loan servicing company located in Elk Grove Village, Illinois.

*Admissions Made During Law Enforcement Interviews*

Defendant and his wife consented to interviews with law enforcement. They confessed to using the stolen identities to submit fraudulent tax returns from their residence. Defendant confirmed that his wife was the individual submitting the fraudulent returns from their home, and admitted to profiting from the scheme. However, they gave conflicting statements about where they obtained the stolen identities. Co-defendant Williams- Liggins identified her mother, Janice Williams, as the source. Co-defendant Williams- Liggins further stated that her mother, Janice Williams, came up with the idea to submit fraudulent returns using stolen identities, and promised to pay defendant for filing the fraudulent returns. Defendant initially identified Janice Williams' husband, Alonzo Owens, as the source of the stolen identities, but later stated he had been mistaken.

In total, defendant caused to be filed with the IRS at least 219 false and fraudulent tax returns seeking refunds of approximately $1,323,793. Defendant admits that as a result of the scheme, the IRS deposited approximately $331,154 in fraudulent refunds into bank accounts jointly controlled by him and co-defendant Williams-Liggins.

The following account holders received refunds (in order of amount of funds received): Williams-Liggins and defendant (joint accounts), defendant (individual accounts), Williams-Liggins (individual accounts), Tillman Liggins Jr. (Liggins' father), Deandre Owens (Williams-Liggins' step-brother), Alonzo Owens Jr. (Williams-Liggins' step-brother), Alonzo Owens (Williams-Liggins' step-father), Janice Williams (Williams-Liggins' mother), Kim Landrum (connection unknown), Vince Shivers (connection unknown), and Evelyn Williams (Williams-Liggins' grandmother).

For purposes of executing this scheme, on or about February 4, 2015, defendant transmitted an ACH transaction through the Federal Reserve system in the amount of approximately $920, which funds represented a tax refund issued by the IRS in the name of taxpayer M.B. for the tax year 2014. The refund was transferred to a bank account jointly controlled by defendant and co-defendant Williams-Liggins.

The refund was issued on a false and fraudulent 2014 tax return in the name of victim taxpayer M.B. that defendant filed on or about January 21, 2015, with the IRS claiming a tax refund of $6,329. The tax return was filed electronically using an

IP address registered to defendant. The 2014 tax return was submitted to the IRS in order to cause the IRS to send money to defendant that defendant knew he was not entitled to receive. In the 2014 tax return, defendant caused to be stated: (a) on Form 1040, Exemptions, that taxpayer M.B. had two dependents, A.S. and M.B.; (b) on Form 1040, lines 12 and 22, that taxpayer M.B. earned business income of $14,721; (c) on Schedule C, that taxpayer M.B. earned $14,721 in business income from a childcare sole proprietorship; (d) on Form 8863, Part III, that taxpayer M.B. and listed dependents, A.S. and M.B., were enrolled in Everest College, an educational institution; (e) on Form 1040, line 40, that taxpayer M.B. was entitled to $9,100 in itemized deductions; (f) on Form 1040, line 42, that taxpayer M.B. was entitled to $11,850 in exemptions; and (g) on Form 1040, lines 75 and 76a, that taxpayer M.B. overpaid his federal taxes in the amount of $6,380 and was entitled to a refund of that amount, whereas defendant well knew at the time that such statements were false and fraudulent.

### *Count Four*

With respect to Count Four, on or about January 21, 2015, defendant knowingly transferred, possessed, and used without lawful authority a means of identification of another person, namely, the name and social security number of taxpayer M.B., during and in relation to the wire fraud offense described above, knowing that the means of identification belonged to another person, in violation of Title 18, United States Code, Section 1028A.

Specifically, on January 21, 2015, defendant filed a 2014 tax return with the IRS using M.B.'s name and social security number. Defendant well knew at the time that M.B. was a real person, that M.B. did not consent to the use of his/her identity for this purpose, and that defendant did not have lawful authority to use M.B.'s identity

### III. Advisory Guidelines Calculations

*Criminal History Category.* The government agrees with the Probation Officer's determination that defendant has seven criminal history points. With three criminal history points, defendant is placed in Criminal History Category IV.

*Offense Level.* The government agrees with the Probation Officer's calculation regarding defendant's offense level of 25. The defendant objects to the two level enhancement pursuant to Guideline § 2B1.1(b)(10)(C).

However, the government believes that the offense conduct in this case warrants the two-level enhancement for use of sophisticated means.[1] Here, the sophisticated means enhancement should apply because the defendant stole the personal identifying information of several individuals, and utilized that information to file false tax returns. This scheme cannot be said to be a "run-of-the-mill" tax evasion case. See *United States v. Fife*, 471 F.3d 750, 753 (7th Cir. 2006) (court stated that sophisticated means are those which are more complex than those involved in

---

[1] Co-defendant Chinita Williams-Liggins was sentenced on July 31, 2019 to a term of 18 months' imprisonment for the wire fraud charge, and a consecutive term of 2 years' imprisonment for the aggravated identity theft charge. During her sentencing hearing, co-defendant Williams- Liggins objected to the imposition of the sophisticated means enhancement. After hearing argument from both sides, this Court imposed the sophisticated means enhancement.

the run-of-the-mill tax evasion case.) The Seventh Circuit has held that "the [sophisticated means] enhancement does not require a brilliant scheme, just one that displays a greater level of planning and concealment than the usual tax evasion case." See *United States v. Bickart*, 825 F.3d 832, 838 (7th Cir. 2014), citing *Fife*, 471 F.3d at 754. For the sophisticated means enhancement to apply, it must only be shown that "some efforts of concealment beyond the concealment inherent in tax fraud" (e.g. presenting a false claim, such as understating income or overstating withholdings on a tax return). *Bickart*, 825 F.3d at 838. Defendant's use of stolen identities to fabricate income tax returns represents concealment that moves beyond basic tax fraud. These actions taken by defendant warrant the application of the two-level enhancement for sophisticated means. The 7th Circuit has determined that similar conduct supported the imposition of the two-level enhancement for "sophisticated means." *See, e.g., United States v. Madoch*, 108 F.3d 761, 766 (7th Cir. 1997) (affirming a sophisticated means enhancement for a return preparer who created fraudulent Forms W-2 and attached them to tax returns to help his customers secure fraudulent refunds).

*Advisory Guidelines Calculations.* It is the government's position, and U.S. Probation agrees that, with placement in Criminal History Category IV and an adjusted offense level of 22, defendant faces an advisory Guidelines range of 63 to 78 months' imprisonment for Count Three (wire fraud), followed by a mandatory consecutive sentence of two years' imprisonment for Count Four (aggravated identity theft).

## IV. Sentencing Recommendation

### A. Applicable Legal Standard

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the "particular" sentence to impose, the court must consider the familiar statutory factors listed in Section 3553(a)(1)-(7). One of those factors is the advisory Guidelines range, and another is the Sentencing Commission's policy statements. *See* 18 U.S.C. §§ 3553(a)(4), (a)(5). Although the Guidelines are advisory, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Indeed, the Supreme Court has made clear that a district court should begin a sentencing hearing by calculating the advisory Guidelines range. *See id.* at 49; *see also United States v. Glosser*, 623 F.3d 413, 418 (7th Cir. 2010).

For two reasons, the Court should give serious consideration to the advisory Guidelines range. First, the Guidelines are the *sole* factor under Section 3553(a) that provides an objective sentencing range that can practically promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily mandated factor under Section 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker v. United States*, 543 U.S. 220, 250 (2005) ("Congress' basic statutory goal – a system that diminishes sentencing disparity"); *Id.* at 253 ("Congress' basic goal in passing the Sentencing Act

was to move the sentencing system in the direction of increased uniformity"); *id.* at 267 (rejecting other remedial alternatives because they were inconsistent with the "basic objective of promoting uniformity in sentencing"). The Supreme Court created the advisory system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker*, 543 U.S. at 264-65. The only way to prevent widespread unwarranted disparities is to give serious consideration to the Guidelines.

Second, the Guidelines generally deserve serious consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46. It is true that there is no "presumption" that a Guidelines sentence is the "correct" sentence, *Rita v. United States*, 551 U.S. 338, 351 (2007), and that there is "broad" sentencing discretion post-*Booker*, *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). However, the Commission is "a respected public body with access to the best knowledge and practices of penology." *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007). Furthermore, the Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system, 28 U.S.C. § 994(o), and these ongoing efforts to refine the Guidelines are another reason to seriously consider the advisory range.

In the event that this Court exercises its discretion to sentence outside the advisory range, there are guideposts for evaluating what the extent of the deviation should be and when a non-Guidelines sentence will be deemed unreasonable on appeal. These guideposts are set forth in Supreme Court and Seventh Circuit cases.

First, the Supreme Court instructs that it is "clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 552 U.S. at 46. The degree of the deviation from the advisory Guidelines range is relevant in choosing the particular sentence:

> If [the judge] decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.

*Id.* at 50. In *Gall*, the Supreme Court affirmed a sentence of probation in an ecstasy distribution conspiracy case where the low-end of the range was 30 months' imprisonment. Although the Court acknowledged the qualitative difference between probation and a sentence of imprisonment, the defendant presented extensive mitigating facts: his only role in the crime was to deliver drugs to other co-conspirators; he had voluntarily stopped distributing drugs "after deciding, on his own initiative, to change his life," which distinguished him from the "vast majority of defendants convicted of conspiracy"; after withdrawing from the drug conspiracy, he graduated from college and obtained steady employment; when confronted by law

enforcement agents, he fully confessed to the crime; when indicted, he moved back to the district in which he was charged and started his own successful business; and he proffered a "small flood" of letters praising his character and work ethic. *Id.* at 41-43, 54-56.

In contrast to the significant and uniquely-personal mitigating facts in *Gall*, the Seventh Circuit warns that major deviations from the advisory range are more likely to be unreasonable if the grounds for the deviation are "overstated mitigating factors" or "normal incidents" of the offense. *United States v. Carter*, 538 F.3d 784, 790 (7th Cir. 2008). Similarly, the Seventh Circuit admonishes that sentences relying on "common" factors, rather than "particularized" ones, to justify variances are less likely to be substantively reasonable. *Id.*; *see also United States v. Vrdolyak*, 593 F.3d 676, 681-83 (7th Cir. 2010). To be sure, these are only guides and not bright-line rules for assessing reasonableness, but they are helpful in preventing excessive sentencing disparities.

### B. Defendant Should Be Sentenced to a Low End Guideline Sentence of 63 Months' Imprisonment Under 18 U.S.C. §3553(a).

Full consideration of the relevant Section 3553(a) factors demonstrates that, as to Count One, a sentence at the low end of the Guidelines range of 63 months' imprisonment is appropriate in this case.

#### 1. Nature and Circumstances of the Offense

First, a sentence within the advisory Guidelines range reflects "the seriousness of the offense" committed by defendant and "provide[s] just punishment for the

11

offense." *See* 18 U.S.C. §3553(a)(2)(A); *United States v. Goldberg,* 491 F.3d 668, 673 (7th Cir. 2007) (The Guidelines are "drafted by a respected public body with access to the best knowledge and practices of penology"); *United States v. Goff,* 501 F.3d 250, 257 (3d Cir. 2007) ("the Guidelines reflect a carefully considered assessment of the seriousness of federal crimes"). The offense in this case is serious. The actual loss defendant and his wife caused the United States to suffer, $331,154, is considerable, and the total amount of money defendant attempted to obtain from the fraudulent tax returns, $1,323,793, is even greater. Moreover, this was not a single impulsive criminal act; rather, defendant filed blatantly false tax returns on at least 219 separate occasions. The defendants used a total of 472 stolen identities to file the fictitious income tax returns.

Without the compliance of taxpayers with our country's tax laws, the federal government would essentially cease to function. When persons such as defendant defraud the IRS and obtain large tax refunds to which they are not at all entitled, all taxpayers and citizens are harmed. The honest taxpayers must shoulder a disproportionate amount of the tax burden, and fewer necessary government services and benefits can be provided when some people cheat the IRS out of substantial sums of money. The IRS had to spend considerable time and money investigating the scheme for which defendant has been convicted. Defendant attempted to take advantage of the tremendous volume of returns that the IRS must process in a timely manner, and he succeeded in doing so.

Just as important (if not more so) as the monetary impact of defendant's criminal conduct is its impact on the legitimacy of our taxpaying system. Our tax system is largely a voluntary reporting system which depends considerably on the honesty and confidence of all taxpayers. When people like defendant engage in a scheme to defraud the IRS, and especially when they succeed in obtaining substantial amounts of money from doing so, it leads law-abiding taxpayers to feel as if the system does not work. The scheme undertaken by defendant damages the faith of the people in the IRS and in the need to comply with our tax laws. If tax fraud is not sufficiently punished, respect for the entire tax system deteriorates.

2.  History and Characteristics of the Defendant

Defendant committed the instant offense while on probation for a 2011 state identity theft offense that involved stolen credit cards. PSR ¶ 46. Co-defendant and defendant were charged together and convicted in that case. PSR ¶ 46. Specifically, co-defendant Williams-Liggins was working as a mail carrier for the United States Postal Service, and it was discovered that she was stealing credit cards from her delivery route and giving them to the defendant to make fraudulent purchases. PSR ¶ 46. Defendant was charged with several counts of identity theft. He pled to a single count of identity theft, and despite his extensive criminal history, he was only sentenced to 14 days' jail and 24 months' probation.[2] PSR ¶ 46. Defendant's probation was not terminated until November 10, 2015. PSR ¶ 46. As previously noted,

---

[2] As noted during co-defendant Williams-Liggins' sentencing hearing, she was originally charged with seven counts of identity theft and one count of conspiracy to commit identity theft. She ultimately pled to a reduced misdemeanor identity theft offense.

13

defendant committed the instant offense from February 2012 through March 2015, meaning that instead of becoming a law abiding citizen, he chose to re-offend and engage in crime almost the entire time he was on state probation. In fact, defendant's conduct escalated, and he began committing theft and fraud against the United States government. Indeed, defendant has an extensive criminal history which spans from misdemeanor arrests to convictions for gun offenses, drug offenses, and state theft related offenses. PSR ¶ 36-64. Defendant's incessant involvement in criminal activity suggests his unwillingness to rehabilitate himself and reform his criminal conduct.

Moreover, defendant's conduct is unjustifiable and difficult to comprehend. It appears that co-defendant Williams-Liggins has been consistently employed, and even owns her own business. There is no indication that defendant or his wife engaged in this crime due to extreme financial hardship. It appears that defendant was primarily motivated by greed. The repeated criminal conduct in this case speaks to the nature of defendant's character.

        3.        The Need for the Sentence to Reflect the Seriousness of the Offense and to Afford Adequate Deterrence to Criminal Conduct

The offenses in this case are egregious and constitute a brazen abuse of this country's income tax system. Defendant's sentence should reflect this. Moreover, a significant sentence consistent with the Sentencing Guidelines is appropriate for deterrence purposes, both specific and general. Defendant's continued criminal acts indicate that specific deterrence is greatly needed in this case.

## V.　Restitution

Defendant is required to make full restitution to the IRS in the amount of $331,154. To date (at least to the government's knowledge), defendant has not paid back any of this restitution. With regard to the timing and source of the restitution payment, the Seventh Circuit has held that there is a "preference" for immediate payment, but that it is not absolutely required. *United States v. Hosking*, 567 F.3d 329, 335 (7th Cir. 2009). As noted in *Hosking*, this preference for immediate payment is grounded in the statutory text: "[T]he court is also required to craft its restitution order 'pursuant to 18 U.S.C. § 3572' . . . which provides that '[a] person sentenced to pay a fine or other monetary penalty, including restitution, shall make such payment immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments.' 18 U.S.C. § 3572(d)(i)." *Hosking*, 567 F.3d at 335.

Here, to the extent defendant does not have sufficient funds immediately available, a schedule of payments should be applied. In addition, the government respectfully requests that the following language be included in the judgment at sentencing as to the timing of payment:

> The Court further orders that the defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations. In addition, 10% of the defendant's future monthly disposable income shall be paid toward any remaining restitution or fine balance. Pursuant to 18 U.S.C. § 3664(k), the defendant must notify the Court and the United States Attorney's Office of any material change in the defendant's ability to pay restitution.

VI. **Proposed Conditions of Supervised Release**

Defendant is subject to a term of supervised release of between one and three years. PSR ¶ 101. With respect to the imposition of supervised release, the Court must: (1) make an independent determination that each condition imposed is rationally and reasonably related to the defendant's particular offense conduct and characteristics, and to the sentencing purposes identified by 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D); (2) state the reasons for imposing each condition; and (3) ensure that each condition is simply worded and not broader than necessary to achieve the purposes of sentencing. *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015); *see also United States v. Siegel*, 753 F.3d 705, 716-17 (7th Cir. 2014); *United States v. Shannon*, 743 F.3d 496, 500 (7th Cir. 2014) (citing 18 U.S.C. § 3583(d)). In light of defendant's particular offense conduct and characteristics, and the sentencing purposes identified by 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D), it is the government's position that the defendant should be ordered to serve a term of supervised release of three years.

    The Probation Officer has recommended a number of conditions of supervised release, following ¶103 of the PSR (pages 25 through 32). The government believes that each of these recommended conditions is appropriate, for one or more of the following reasons: to facilitate supervision by the Probation Office, thus assisting in encouraging the defendant's compliance with the law and deterring the defendant from future crimes; to support the defendant's rehabilitation and to help ensure that the defendant is engaged in lawful pursuits

rather than criminal activity, in light of the defendant's specific history and characteristics; and to help ensure that the defendant is engaged in responsible financial behavior while on supervised release, consistent with the need to meet the financial obligations ordered as part of his sentence, taking into account his financial circumstances. The government has no additional conditions to suggest.

## Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence at the low end of the Guidelines range of 63 months' imprisonment for Count Three, in addition to the mandatory two-year consecutive sentence for Count Four, and order a period of three -years supervised release.

Respectfully submitted,

JOHN R. LAUSCH, JR
United States Attorney

By: s/ *Kalia Coleman*
Kalia Coleman
Assistant U.S. Attorney
United States Attorney's Office
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-3540

Dated: October 16, 2019

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

was served on October 16, 2019, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing pursuant to the district court's system as to ECF filers.

s/ Kalia Coleman
KALIA COLEMAN
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
(312) 353-3540
